**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, *as assignee of individuals who are Covered Persons,* PATRICK COLLIGAN and PETER ANDREYEV,<br><br>Plaintiffs,<br><br>v.<br><br>STERLING DATA COMPANY LLC, RICHARD ROES 1-10, *fictitious names of unknown individuals* and ABC COMPANIES 1-10, *fictitious names of unknown entities,*<br><br>Defendants. | Case No.: 1:25-cv-09963-HB<br><br>*Motion Return Date:*<br>*December 15, 2025* |

---

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT STERLING DATA COMPANY LLC'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

---

**REED SMITH LLP**
*Formed in the State of Delaware*
Diane A. Bettino, Esq.
David G. Murphy, Esq.
506 Carnegie Center – Suite 300
Princeton, New Jersey 08540
Tel. (609) 514-5947
Fax (609) 951-0824

*Attorneys for Defendant*
*Sterling Data Company LLC*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

PROCEDURAL HISTORY.......................................................................2

    A.    Relevant Procedural History Specific to this Matter ............................2

    B.    Relevant Procedural History for Related *Atlas* Matters.......................3

        i.    Denial of *Rule* 12(b)(6) Motion to Dismiss Based on Facial First Amendment Challenge; Pending Appeal Before the United States Court of Appeals for the Third Circuit and Supreme Court of New Jersey. .....................3

        ii.    Denial of *Rule* 12(b)(6) Motions to Dismiss Challenging Sufficiency of Factual Allegations.......................5

        iii.    Denial of *Rule* 12(b)(6) Motions to Dismiss Based on Preemption Via Several Federal Statutes....................................7

STATEMENT OF FACTS .......................................................................8

    A.    Allegations in the Complaint..................................................8

    B.    Publicly-Available Facts About Sterling's Political Campaign Finance Operations That Plaintiffs Omitted From the Complaint ...................................................................10

STANDARD OF REVIEW .....................................................................12

LEGAL ARGUMENT...........................................................................15

I.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE DANIEL'S LAW, AS APPLIED TO STERLING, VIOLATES STERLING'S CONSTITUTIONALLY PROTECTED RIGHT TO FREEDOM OF SPEECH ................................15

    A.    Strict Scrutiny Applies to Laws That Regulate Political Speech and Restrict Campaign Finance Contributions......................17

    B.    The State's Interest In Daniel's Law Is Insufficient and Too Inconsistent to Constitute a Compelling, or Even Significant, Government Interest ..........................................................25

    C.    Daniel's Law Is Not Narrowly Tailored to a Compelling Government Interest, Or Even Closely Drawn to a Significant Interest, As The Enforcement of Daniel's Law Against Sterling Has No Connection To The Apparent Goals of the Legislation..................................................................29

II.    STERLING JOINS IN THE OTHER ARGUMENTS
       ADVANCED IN SUPPORT OF OTHER DEFENDANTS'
       MOTIONS TO DISMISS .................................................................................35

CONCLUSION ...............................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital
     Mgmt. L.P.*,
     435 F.3d 396 (3d Cir. 2006) ..................................................................15

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
     564 U.S. 721 (2011)...............................................................18, 21, 23

*Ashcroft v. Iqbal*,
     556 U.S. 662 (2009)...........................................................................5, 13

*Atlas Data Privacy Corp. v. We Inform, LLC*,
     2025 U.S. Dist. LEXIS 122792 (D.N.J. June 27, 2025)...................5, 6

*Atlas Data Privacy Corp. v. We Inform, LLC*,
     2025 U.S. Dist. LEXIS 164797 (D.N.J. Aug. 25, 2025) ..................7, 8

*Atlas Data Privacy Corp. v. We Inform, LLC*,
     758 F. Supp. 3d 322 (D.N.J. 2024), *appeal pending*, No. 25-1555
     (3d Cir.)......................................................................................*passim*

*Barr v. Am. Ass'n of Pol. Cons.*,
     591 U.S. 610 (2020)...............................................................24, 27, 28

*Bell Atlantic Corp. v. Twombly*,
     550 U.S. 544 (2007)...........................................................................5, 13

*Benamax Ice, LLC v. Merch. Mat. Ins. Co.*,
     529 F. Supp. 3d 350 (D.N.J. 2021) ...................................................14

*Brown v. Ent. Merchs. Ass'n*,
     564 U.S. 786 (2011)...................................................19, 29, 31, 32

*Buck v. Hampton Twp. Sch. Dist.*,
     452 F.3d 256 (3d Cir. 2006) .............................................................15

*Buckley v. Valeo*,
     424 U.S. 1 (1976)......................................................................20, 22, 25

*In re Burlington Coat Factor Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ...............................................................13

*Central Me. Power Co. v. Me. Comm'n on Gov't Ethics & Elec.
   Prac.*,
   144 F.4th 9 (1st Cir. 2025) .....................................................................23

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U. S. 520 (1993)........................................................................28, 33

*CitiSteel USA, Inc. v. GE*,
   78 F. App'x 832 (3d Cir. 2003) .............................................................14

*Citizens United v. Fed. Elec. Comm'n*,
   558 U.S. 310 (2010)..........................................................16, 17, 23, 24

*City Indianapolis v. Edmond*,
   531 U.S. 32 (2000)..................................................................................27

*City of Ladue v. Gilleo*,
   512 U. S. 43 (1994)..................................................................................28

*Col. Rep. Fed. Campaign Comm. v. Fed. Elec. Comm'n*,
   518 U.S. 604 (1996)................................................................................30

*Corp. Synergies Grp., LLC v. Andrews*,
   2019 U.S. Dist. LEXIS 135293 (D.N.J. Aug. 12, 2019) ...................13

*Davis v. Fed. Elec. Comm'n*,
   554 U.S. 724 (2008)..........................................................................21, 23

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)................................................................................27

*Eu v. S.F. Cnty. Dem. Cent. Comm.*,
   489 U.S. 214 (1989)................................................................................16

*Fed. Elec. Comm'n v. Nat'l Conservative P.A.C.*,
   470 U.S. 480 (1985)................................................................................22

*Fed. Elec. Comm'n v. Ted Cruz for Senate*,
   596 U.S. 289 (2022)........................................................................*passim*

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978)..................................................................16, 17

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989)..................................................................18, 19

*Free Speech Coal., Inc. v. Paxton*,
  145 S. Ct. 2291 (2025).....................................................................29

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)...............................................................................29

*Hughes v. UPS*,
  639 F. App'x 99 (3d Cir. 2016)........................................................14

*Jackson v. Whitepages, Inc.*,
  2025 U.S. Dist. LEXIS 160341 (D. W.Va. Aug. 18, 2025) ........18, 33

*Kratovil v. City of New Brunswick*,
  261 N.J. 1 (2025) .........................................................................18, 33

*Mazo v. N.J. Sec'y of State*,
  54 F.4th 124 (3d Cir. 2022) ..............................................................17

*McCullen v. Coakley*,
  573 U.S. 464 (2014)............................................................................18

*McCutcheon v. Fed. Elec. Comm'n*,
  572 U. S. 185 (2014)...................................................................*passim*

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)............................................................................16

*Miller v. Ziegler*,
  109 F.4th 1045 (8th Cir. 2024) .........................................................24

*Monitor Patriot Co. v. Roy*,
  401 U.S. 265 (1971)......................................................................16, 20

*Nixon v. Shrink Mo. Gov't PAC*,
  528 U.S. 377 (2000)......................................................................20, 30

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*,
   475 U.S. 1 (1986) ..............................................................................16

*PBGC v. White Consol. Indus.*,
   998 F.2d 1192 (3d Cir. 1993) ...................................................14, 15

*Pryor v. NCAA*,
   288 F.3d 548 (3d Cir. 2002) .............................................................14

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ..........................................................................25

*Revell v. Port Auth. of N.Y. & N.J.*,
   598 F.3d 128 (3d Cir. 2010) .............................................................13

*Rickenbach v. Wells Fargo Bank, N.A.*,
   635 F. Supp. 2d 389 (D.N.J. 2009) ...................................................15

*Sable Comm's of Cal. Inc. v. FCC*,
   492 U.S. 115 (1989) ....................................................................22, 25

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014) .......................................................13, 15

*Smith v. Daily Mail Pub. Co.*,
   443 U.S. 97 (1979) ............................................................................18

*United States v. Alvarez*,
   567 U.S. 709 (2012) ...............................................................19, 29, 30

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ....................................................................31, 32

*Yellowbear v. Lampert*,
   741 F. 3d 48 (10th Cir. 2014) ..........................................................28

## Statutes

18 U.S.C. § 2339B(a)(1) ........................................................................29

N.J.S.A. § 47:1B-3(a)(1)(a) to (e) .........................................................32

N.J.S.A. § 47:1B-3(a)(2) to (7) .............................................................32

N.J.S.A. § 56:8-166.1................................................................................................33

N.J.S.A. § 56:8-166.1(d).....................................................................................33, 34

N.J.S.A. § 56:8-166.1(f)............................................................................................32

**Rules**

Fed. R. Civ. P. 8........................................................................................................5

Fed. R. Civ. P. 12....................................................................................................15

Fed. R. Civ. P. 12(b)(6).................................................................................3, 5, 7, 13

Fed. R. Civ. P. 12(c)..........................................................................2, 12, 13, 14

L. Civ. R. 7.1(d)(4)...................................................................................................35

## PRELIMINARY STATEMENT

Plaintiffs Atlas Data Privacy Corporation, as assignee of individual who are "Covered Persons" ("Atlas"), Patrick Colligan ("Colligan"), and Peter Andreye ("Andreyev") (collectively, "Plaintiffs") filed a form complaint against Defendant Sterling Data Company LLC ("Sterling") alleging, based on perusing Sterling's website, that it violated Daniel's Law, N.J.S.A. §§ 47:1B-1 to -4 and 56:8-166.1. According to the Complaint, without knowing whether purported information concerning any specific "Covered Persons" was available to the public on Sterling's websites, Atlas claims it inundated Sterling with requests to remove home addresses and/or unpublished phone numbers on behalf of approximately 21,000 individuals who signed up for Atlas' services and assigned their rights to collect statutory damages from Sterling should it fail to honor the takedown requests within ten business days. The named individual Plaintiffs, Colligan and Andreyev, purportedly utilized Atlas' services along with the other 21,000 unidentified "Covered Persons," and now seek damages against Sterling for allegedly failing to honor tens of thousands of takedown requests submitted at approximately the same time.

Plaintiffs claims against Sterling fail, as a matter of law, because Daniel's Law, as applied to Sterling, violates Sterling's freedom of speech as guaranteed by the First Amendment to the United States Constitution, as well as Article I, Section 6, of the New Jersey State Constitution, and several other states' guaranties of

Sterling's freedoms. While the Complaint relies on Sterling's website to allege that it is a "databroker" and obtained an email address to submit takedown requests to its privacy-specific mailbox, the Complaint intentionally omits that Sterling is a campaign financing vendor for Democratic candidates for state and federal offices. As a matter of public record, Sterling is hired by political campaigns and candidates in connection with political fundraising efforts. So, not only is Sterling an implausible vehicle for a criminal to locate confidential information about individuals to commit crimes, Atlas' application of Daniel's Law to Sterling plainly and impermissibly violates Sterling's constitutionally-guaranteed right to freedom of speech. Simply, as applied to Sterling, Daniel's Law cannot withstand strict scrutiny (or even "closely drawn" or "exacting" scrutiny).

For these reasons, as set forth in more detail below, Sterling's motion for judgment on the pleadings, pursuant to *Fed. R. Civ. P.* 12(c), should be granted, and Plaintiffs' Complaint against Sterling should be dismissed with prejudice.

## PROCEDURAL HISTORY

### A.    Relevant Procedural History Specific to this Matter

Plaintiffs filed the Complaint in the Superior Court of New Jersey, Law Division, Union County on April 30, 2025. (Dkt. No. 1-1). Sterling timely removed this matter to this Court on June 11, 2025. (Dkt. No. 1). On June 12, 2025, a status conference was held for this matter, along with dozens of similar matters that had

- 2 -

been filed on behalf of Plaintiffs.  (Dkt. No. 3).  On June 17, 2025, following the status conference, the Court stayed this matter.  (Dkt. No. 8).  Another status conference was held on September 12, 2025, after which the Court vacated the stay and entered a scheduling order.  (Dkt. No. 11).  On October 27, 2025, Sterling filed its Answer and Affirmative Defenses.  (Dkt. No. 15).  Sterling now moves for judgment on the pleadings.

### B.    Relevant Procedural History for Related *Atlas* Matters

The Complaint against Sterling is one of the most recent in a series of more than one hundred lawsuits filed by Plaintiffs against databrokers, dating back to approximately February 2024.  Many of these actions had been consolidated for various phases of litigation long before Plaintiffs commenced this matter against Sterling, resulting in several decisions and pending appeals, some of which impact the scope of this motion.

### i.    Denial of *Rule* 12(b)(6) Motion to Dismiss Based on Facial First Amendment Challenge; Pending Appeal Before the United States Court of Appeals for the Third Circuit and Supreme Court of New Jersey.

On November 26, 2024, this Court entered a decision in *Atlas Data Privacy Corp. v. We Inform, LLC*, 758 F. Supp. 3d 322 (D.N.J. 2024), *appeal pending*, No. 25-1555 (3d Cir.), addressing the defendants' consolidated motions to dismiss the complaints on the grounds that Daniel's Law is facially unconstitutional because it infringes the defendants' freedom of speech.  As noted in § II of the Argument

section below, Sterling joins, adopts, and incorporates the arguments raised by defendants in these consolidated motions.

The challenge had two discreet flavors, but both were rejected. First, the Court held that though Daniel's Law restricts more than commercial speech and is content-based, it is not subject to strict scrutiny and narrow tailoring to fit a compelling government interest—instead, the Court applied a three-part test for whether privacy interests may surmount free-speech protections. *Id.* at 336–339. In not applying strict scrutiny and holding Daniel's Law facially constitutional, the Court held that the home addresses and unlisted phone numbers of "Covered Persons" are not matters of public significance, Daniel's Law advances a significant state interest,[1] and the statute is not underinclusive. *Id.* In finding that Daniel's Law survived the defendants' facial First Amendment challenge, the Court remarked that defendants may "challenge Daniel's law as unconstitutional as applied." *Id.* at 337.

Second, the Court rejected the defendants' argument that Daniel's Law is unconstitutional because it is effectively a "strict liability" statute and is, therefore, unconstitutionally overinclusive. Noting the statute's unhelpful silence on the issue, the Court held that the takedown notice mechanism in Daniel's Law, which affords

---

[1] The Court also held that no defendants contested that the statute "serves a need to further a state interest of the highest order." *Id.* at 337.

defendants ten business days to comply with a request from a "Covered Person," contains an implied negligence standard of culpability. *Id.* at 339–341.

The defendants appealed (which was accepted on an interlocutory basis and expedited). In the course of deliberating over the parties' arguments in the appeal, on July 8, 2025, the United States Court of Appeals for the Third Circuit issued a Petition and Order to Certify Questions of State Law. (Case No. 25-1555, Dkt. No. 103). The Third Circuit certified two questions to the Supreme Court of New Jersey: "1. Does Daniel's Law … require a *mens rea* for any of its elements?" and "2. If so, what level of *mens rea* is required for each element?" (*Id.* at 11). The Supreme Court of New Jersey docketed the certified questions on September 4, 2025. (*See* N.J. eCourts Supreme, Case No. 091145).

### ii.    Denial of *Rule* 12(b)(6) Motions to Dismiss Challenging Sufficiency of Factual Allegations.

On June 27, 2025, this Court entered a decision in *Atlas Data Privacy Corp. v. We Inform, LLC*, 2025 U.S. Dist. LEXIS 122792 (D.N.J. June 27, 2025), denying motions to dismiss filed by numerous defendants in which they argued that the Complaint (which is substantially the same form filed in this matter) failed to meet the pleading requirements of *Rule* 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Court denied the defendants' motions—generally, the Court found that the complaints contained sufficient factual allegations to state a claim and proceed to discovery. Again, as

noted in § II of the Argument section below, Sterling joins, adopts, and incorporates the arguments raised by defendants in these consolidated motions.

First, the Court held, in relevant part, that the complaint need not identify each "Covered Person" because that information would be subsequently provided by Atlas. *Id.* at *31–32. Second, the Court rejected defendants' arguments that notices were invalid if sent by Atlas, rather than directly by the "Covered Persons." *Id.* at *32. Third, the Court rejected the defendants' contentions that the takedown notices, as sampled in the complaints, were defective. *Id.* at *33–35. Fourth, the Court found that there was a rebuttable presumption that takedown notices were received by defendants. *Id.* at *35. Fifth, the Court held the complaints sufficiently alleged that defendants failed to cease non-disclosure or re-disclosure after receipt of takedown notices. *Id.* at *35–36. Sixth, the Court held the complaints sufficiently alleged the elements of "negligence" within the Daniel's Law statutory scheme. *Id.* at *36–37. Seventh, the Court held that the complaints need not provide more detail about any of the plaintiffs' or covered persons' damages or claims to entitlement for injunctive relief. *Id.* at *37–40.

Finally, the Court rejected a challenge to extraterritorial application of Daniel's Law, holding that the statute protects information about New Jersey residents and applies broadly to activities that take place out of the state of New Jersey. *Id.* at *41–45.

### iii.    Denial of *Rule* 12(b)(6) Motions to Dismiss Based on Preemption Via Several Federal Statutes.

On August 25, 2025, this Court entered a decision in *Atlas Data Privacy Corp. v. We Inform, LLC*, 2025 U.S. Dist. LEXIS 164797 (D.N.J. Aug. 25, 2025), this time addressing several preemption arguments advanced by several defendants. Sterling preserves its right to assert defenses based on preemption at a later stage of litigation, should the Complaint survive this motion to dismiss.

First, the Court rejected arguments by defendants who "obtain[] and publish[] publicly available voter records" on their website, thereby rendering Daniel's Law preempted by the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501, *et seq. Id.* at *8–9. The Court held that "[t]he NVRA does not prohibit what Daniel's Law authorizes," hence there is "no conflict between these laws." *Id.* at *9.

Second, the Court rejected preemption arguments premised on the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230, as premature and requiring further development in discovery, as the arguments required a deeper analysis of whether the defendants advancing this argument developed the information that is available on their websites, or if they are merely posted and supplied by third-parties, which may warrant protection. *Id.* at *11–14.

Third, the Court partially rejected a credit reporting agency's preemption arguments premised on the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq. Id.* at *14–19. The Court held that discovery was needed concerning the

manner in which the credit reporting agency discloses home addresses and unlisted telephone numbers on its credit reports. *Id.* at *16. The Court granted the motion to dismiss to the extent Daniel's Law and the FCRA had inconsistent time requirements for removing home addresses and unlisted telephone numbers from reports upon receipt of a takedown request. *Id.* at *18–19.

## STATEMENT OF FACTS

### A.    Allegations in the Complaint

Most of the Complaint, which is a form, is comprised of allegations about the events and legislative history that led to the passage of Daniel's Law by the New Jersey legislature; only a small portion of the Complaint contains any allegations concerning Sterling and how it allegedly violated Daniel's Law. (*See generally* Dkt. No. 1-1 ("Compl.")).

The named Plaintiffs, Colligan and Andreyev, allege that they are the President and former-President, respectively, of the New Jersey State Policemen's Benevolent Association, which has tens of thousands of members, and that they each have been targeted with threats of violence on account of their public service. (Compl. at ¶¶ 18–19). Neither allege that they have ever been targeted due to any actions taken by Sterling, and the Complaint is devoid of allegations that any threats Plaintiffs received were related to their home address and/or unlisted phone number being available on the internet. (*See id.*).

Atlas alleges that it is the assignee of 21,067 "Covered Persons," who, along with Colligan and Andreyev, "each exercised their rights under Daniel's Law by sending Defendants [sic] a written notice requesting that Defendants [sic] cease disclosing or re-disclosing on the Internet or otherwise making available their protected information on one or more of Defendants' [sic] websites or through other methods of disclosure." (*Id.* at ¶¶ 21–24).

The Complaint does not allege that Sterling ever once actually disclosed any "Covered Persons" home address or unlisted phone number—in conclusory fashion, Plaintiffs allege that "Defendants [sic] have not complied with the law by negligently failing to cease the disclosure or re-disclosure on the Internet or the otherwise making available of protected information as required under Daniel's Law." (*Id.* at ¶ 25). Notably, in describing how "Covered Persons" select databrokers to be recipients of takedown requests, there is no indication that the listed databrokers actually have or ever disclosed Covered Persons' personal information—Plaintiffs allege that they do not have any basis to believe databrokers have their information at all; takedown requests are sent blindly. (*See id.* at ¶ 30).

As for Sterling, the Complaint is comprised of boilerplate allegations that it is a "databroker" that "discloses or re-discloses on the Internet or otherwise makes available the home address and/or unpublished home telephone numbers of Covered Persons." (*Id.* at ¶ 35). The Complaint describes Sterling's websites in alleging that

"Defendants [sic] offer and engage in the disclosure of data and information through one or more websites, applications, or otherwise in New Jersey." (*Id.* at ⁋ 37).  The Complaint then describes "Defendants' business model" to allege that  "visitors, users, or customers may obtain a name and home address and/or a name and unpublished home telephone number (including the name and address and/or unpublished home telephone number of the Individual Plaintiffs and Covered Persons)." (*Id.* at ⁋ 38).

Though silent about Colligan and any other Covered Persons, the Complaint provides an image of an electronic takedown request submitted on behalf of Andreyev to privacy@sterling.ai (an email address obtained from Sterling's website), dated August 20, 2024, requesting Sterling not disclose his purported home address.  (*Id.* at ⁋ 50).  Plaintiffs allege that this request was not complied with in accordance with the 10-business-day time limit provided for in Daniel's Law.  (*Id.* at ⁋ 51).  Based on this alleged violation, Plaintiffs allege that all Covered Persons' undescribed takedown requests were not honored by Sterling.  (*See id.*).

## B.    Publicly-Available Facts About Sterling's Political Campaign Finance Operations That Plaintiffs Omitted From the Complaint

Plaintiffs rely on news articles to expound on Daniel's Law and to imply all databrokers are subjecting each of them to the same harms suffered by newsworthy crime victims.  The Complaint also relies on portions of Sterling's website to allege that, as part of its "business model," it discloses Plaintiffs' information on the

internet, though Plaintiffs do not attach the webpages that they rely on and which are integral to the Complaint. (*See generally* Compl.). The Complaint, however, selectively omits that Sterling is engaged in fundraising for political candidates: "Sterling is a company engaged in assisting candidates, campaigns, and nonprofits with fundraising efforts, with a variety of products and services." (Dkt. No. 15 (Ans., Ex. A (Terms and Conditions)). Sterling's "[c]lients[] include [] political campaigns, political organizations, NGO's, non-profits, and other persons or entities looking for fundraising, financing, or similar services." (Ans. Ex. B at § 4.2 (Privacy Policy)). Sterling has "worked with over 1,000 campaigns, nonprofits, and businesses." (Ans., Ex. C ("Sterling for Politics" page)).

Notably, Sterling's operations are specific to one political party—it is a Democratic campaign finance and fundraising company. Besides the home page displaying campaign badges for various Democratic candidates, political committees, and causes (*see* Ans., Ex. D ("George Whitesides for Congress"; "Gretchen Whitmer for Governor"; "Andy Kim for New Jersey"; "CBC PAC"; "Elect Democratic Women"; "GreenPeace")), Sterling has received news coverage for its services for Democratic campaigns, candidates, and lawmakers. *See, e.g.*, Forbes, "How Artificial Intelligence Swayed the Midterm Elections – And Will

Become a Permanent Feature of Democracy" (Dec. 2, 2022)[2] (describing Sterling as a "Democratic data technology company in the fundraising space," and how Sterling "helped both the DCCC and [Sen. John] Fetterman" fundraise for political campaigns); CNN, "The AI political campaign is here" (May 3, 2023)[3] (noting that Sterling "works with Democratic campaigns"); Axios, "AI becomes a political 'super-weapon'," (Oct. 7, 2022)[4] (describing Sterling as a "Democratic firm," recounting how it "has worked with about 1,000 Democratic campaigns and political committees," and that its services are "a super-weapon that Democrats have"). In other words, as a matter of public knowledge based on Sterling's public website and media coverage, indisputably Sterling is a Democratic campaign finance vendor.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed, but early enough not to delay trial, a party may move for judgment on the

---

[2] *Available at* https://www.forbes.com/sites/craigsmith/2022/12/02/how-artificial-intelligence-swayed-the-midterm-electionsand-will-become-a-permanent-feature-of-democracy/ (last visited Oct. 14, 2025). A copy of this article is attached to the Certification of David G. Murphy, Esq. ("*Murphy Cert.*") as Exhibit 1.

[3] *Available at* https://www.cnn.com/2023/05/02/politics/ai-election-ads-2024 (last visited Oct. 14, 2025). A copy of this article is attached to the *Murphy Cert.* as Exhibit 2.

[4] *Available at* https://www.axios.com/2022/10/07/ai-becomes-a-political-super-weapon (last visited Oct. 14, 2025). A copy of this article is attached to the *Murphy Cert.* as Exhibit 3.

pleadings." "Pleadings are 'closed' after the complaint and answer are filed." *Corp. Synergies Grp., LLC v. Andrews*, 2019 U.S. Dist. LEXIS 135293, *4 (D.N.J. Aug. 12, 2019). The motion is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

To survive a Rule 12(c) motion, a plaintiff is "obligat[ed] to provide the grounds of [its] entitle[ment] to relief," which "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). In evaluating a motion for judgment on the pleadings, a court must ignore the "complaint's 'bald assertions,'" *In re Burlington Coat Factor Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997), and sweeping "legal conclusion[s] couched as [] factual allegation[s]." *Twombly*, 550 U.S. at 555. "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Ultimately, if the factual allegations fail "to raise a right to relief above the speculative level," the reviewing court must dismiss the claim. *Twombly*, 550 U.S. at 555.

In considering a motion to dismiss, a court may consider a "document integral to or explicitly relied upon in the complaint … without converting the motion to dismiss into one for summary judgment." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d

Cir. 2014). Where a complaint references integral documents, but fails to attach them in whole or in part to the complaint, the Court may rely on those documents if attached to the defendant's motion. *Hughes v. UPS*, 639 F. App'x 99, 103 (3d Cir. 2016) ("Even if a plaintiff does not attach the subject documents to the complaint, the court may consider them if a defendant attaches them to a motion to dismiss."); *see also CitiSteel USA, Inc. v. GE*, 78 F. App'x 832, 835 (3d Cir. 2003) (quoting *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)) ("Merely attaching documents to a Rule 12(c) motion … does not convert it to a motion under Rule 56. In ruling on a motion to dismiss, a trial court 'may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'"); *id.* (quoting *Pryor v. NCAA*, 288 F.3d 548, 559 (3d Cir. 2002) ("Further, in ruling on the motion a court generally has 'discretion to address evidence outside the complaint[.]'"). This includes consideration of the entirety of a document where a complaint selectively references portions of it. *See Benamax Ice, LLC v. Merch. Mat. Ins. Co.*, 529 F. Supp. 3d 350, 357 (D.N.J. 2021) ("[C]onsideration of the entire insurance policy is appropriate at this stage, even though it was not attached to the Complaint, because courts may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citation and quotation marks omitted).

Further, in evaluating a *Rule* 12 motion, the Court may look beyond the pleadings to "items subject to judicial notice." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). This includes publicly-available documents, such as new stories and articles; courts may take judicial notice of news reports to evaluate "what was in the public realm" at a given time. *See Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

A plaintiff's failure to attach referenced documents to a complaint may not serve to avoid the language of integral documents or judicially noticeable facts. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3rd Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994); *Schmidt v. Skolas*, 770 F.3d 241, 250 (3d Cir. 2014) (holding a plaintiff should not "evade accountability … simply by not attaching [documents] to his complaint."). Finally, "[w]here there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control.'" *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 398 (D.N.J. 2009).

## <u>LEGAL ARGUMENT</u>

I.    **THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE BECAUSE DANIEL'S LAW, AS APPLIED TO STERLING, VIOLATES STERLING'S CONSTITUTIONALLY PROTECTED RIGHT TO FREEDOM OF SPEECH**

Before the court is a unique as-applied constitutional challenge; Sterling's operations revolve around purely political speech and campaigns for political office,

as it is directly involved in messaging, campaign financing, and fundraising efforts for current and prospective candidates for state and federal elected offices.  Because of this, and unlike the Court's prior analysis on facial challenges concerning speech on issues of "public significance," Daniel's Law is subject to strict scrutiny (or at worst, the "closely drawn" or "exacting" scrutiny).

Sterling, as a vendor for political campaigns, committees, and causes, enjoys the same First Amendment protections as its clients, and is engaged in political speech directly on their behalf.  As noted throughout this brief, "the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Eu v. S.F. Cnty. Dem. Cent. Comm.*, 489 U.S. 214, 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)), and this principle applies equally to candidate-based and issue-based elections.  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).  Further, "political speech does not lose First Amendment protection 'simply because its source is a corporation.'" *Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 342 (2010) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978)).  "Corporations …, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783).  Accordingly, the political speech of corporations should is treated no

differently than the speech of American "natural persons." *Citizens Un.*, 558 U.S. at 343 (quoting *Bellotti*, 435 U.S. at 776).

Accordingly, Daniel's Law, as applied to Sterling, fails to withstanding the First Amendment and co-extensive state constitutional free-speech guarantees. Daniel's Law is subject to strict scrutiny (or at worse, slightly lesser "closely drawn" or "exacting" scrutiny"), and from there, Daniel's Law fails to advance a compelling government interest and is not sufficiently tailored to fit the interests underpinning Daniel's Law. Accordingly, Plaintiffs' claims (which are based entirely on Daniel's Law) fail as against Sterling, as a matter of law.

### A. Strict Scrutiny Applies to Laws That Regulate Political Speech and Restrict Campaign Finance Contributions

Political speech "must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United*, 558 U.S. at 340. Political speech is entitled to the highest level of protection the Constitution offers, as "[n]owhere are the First Amendment rights of free speech and association more essential, or more fiercely guarded, than in the context of free and open elections." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 131 (3d Cir. 2022). "Preserving the integrity of the electoral process, preventing corruption, and sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government are interests of the highest importance." *Bellotti*, 435 U.S. at 788–89 (cleaned up).

Where "[l]aws … burden political speech," the State bears the obligations to establish that any attempt to restrict political speech "furthers a compelling interest and is narrowly tailored to achieve that interest … [in the] least restrictive means" possible. *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011); *see also McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

With respect to Daniel's Law, the Court has already determined that Daniel's Law imposes content-based restrictions that would be subject to "strict scrutiny," but for a balancing test where the stated justification for the law is "privacy." *Atlas*, 758 F. Supp. 3d at 336; *but see Jackson v. Whitepages, Inc.*, 2025 U.S. Dist. LEXIS 160341 (D. W.Va. Aug. 18, 2025) (applying "strict scrutiny" to West Virginia's version of Daniel's Law, and that the *Atlas* decision "does not sway this court's conclusion that strict scrutiny applies"); *see also Kratovil v. City of New Brunswick*, 261 N.J. 1, 18–19 (2025) (applying a three-part test derived from *Florida Star v. B.J.F.*, 491 U.S. 524 (1989) and *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979), where application of Daniel's Law impacted news reporter's publication of information of "public concern").

Notwithstanding this Court's generalized analysis that Daniel's Law regulates more than "commercial speech," but issues of "public concern" do not warrant strict scrutiny in the face of privacy considerations, *see Atlas*, 758 F. Supp. 3d at 334, the Court has not yet considered this unique challenge; as a applied, Daniel's Law

infringes Sterling's political speech, particularly within the realm of political campaigning. No court in the United States has derived a three-part test from *Florida Star* or *Daily Mail*, like this Court has in its earlier *Atlas* decision, to strip application of strict scrutiny (or even the slightly lesser standard of "closely drawn" or "exacting scrutiny") for political speech. In not applying strict scrutiny in its prior decision, this Court remarked "[t]he words 'strict scrutiny' and the strict scrutiny standard of review … do not appear" in *Florida Star* and *Daily Mail*. *Atlas*, 578 F. Supp. 3d at 336. Critically, the word "political" does not appear in those decisions either—*Florida Star* and *Daily Mail* concern the news media and the private publication of matters of "public significance," and neither touches on political or campaign speech. Indeed, no court has ever held that the heightened protections for political speech must give way to a balancing test for privacy torts.

"The First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Fed. Elec. Comm'n v. Ted Cruz for Senate*, 596 U.S. 289, 308 (2022) (cleaned up). The speech restriction at issue must be "actually necessary to achieve [the Government's] interest," *United States v. Alvarez*, 567 U.S. 709, 725 (2012), and this "demanding standard" is rarely satisfied. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). At minimum, to satisfy this standard, the State must marshal "record evidence or legislative findings demonstrating the need to address a special problem." *Ted Cruz for Senate*, 596 U.S. at 307. "[T]he

Government bears the burden of proving the constitutionality of its actions," and "[m]ere conjecture" is insufficient. *McCutcheon v. Fed. Elec. Comm'n*, 572 U. S. 185, 210 (2014). If the purported justifications are novel or implausible, the Government must offer even more evidence to support speech restrictions. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).

Generally, State attempts to restrict political campaign finance and fundraising are met with skepticism by the Supreme Court. In the most recent case, *Ted Cruz for Senate*, the Court recounted that "[t]he First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" 596 U.S. at 302 (quoting *Roy*, 401 U.S. at 272). "This broad protection … 'reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976)). In *Ted Cruz for Senate*, the offending provision was Section 304 of the Bipartisan Campaign Reform Act of 2002, 52 U.S.C. §§ 30101 to -146 (the "BCRA"), and its implementing regulations, which restricted post-election refunds for campaign loans. Senator Ted Cruz made a personal loan to his own 2018 senatorial campaign, and following the campaign, he sought repayment, but Section 304 limited the amount of the refund to $250,000. *Ted Cruz for Senate*, 596 U.S. at 293–295. Senator Cruz challenged Section 304 as unconstitutional, and the Supreme Court agreed. *Id.*

The Court held that, as an axiomatic principle of free speech jurisprudence, empirical evidence of burdening political speech is not necessary to strike down offending legislation as unconstitutional. *Id.* at 303 (citing *Bennett*, 564 U.S. at 745–46; *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 738–40 (2008)).  Restrictions that inhibit political campaign finance are a "drag" on a candidate's First Amendment rights, and such restrictions are "no less burdensome 'simply because [they] attach[] as a consequence of a statutorily imposed choice.'" *Id.* at 303–04 (quoting *Bennett*, 564 U.S. at 739).  "[I]nhibiting a candidate from using [a] critical source of campaign funding… raises a barrier to entry [for political candidates]—thus abridging political speech." *Id.* at 304.

In *Ted Cruz for Senate*, the Court did not decide whether typical "strict scrutiny" or a different flavor, "closely drawn scrutiny," applied to Section 304 of the BCRA[5] because, under either standard, the Government failed to demonstrate a legitimate purpose for the regulation. *Id.* at 305.  When weighing restrictions on political speech and campaign financing efforts, the Court may employ one of two levels of rigorous scrutiny, depending on whether contributions or expenditures are

---

[5] Campaign expenditures, contributions, and solicitations are generally governed by the BCRA, which amended the Fair Election Campaign Act of 1971 ("FECA"), along with a litany of state laws (to the extent they are not preempted), thus the expansive body of case law on free speech issues for campaign financing usually pass through these statutes.

impacted. *McCutcheon*, 572 U.S. at 196–97 (citing *Buckley*, 524 U.S. at 14; *Sable Comm's of Cal. Inc. v. FCC*, 492 U.S. 115, 126 (1989)). If the State regulates "expenditures," strict scrutiny is required, as such limits "'necessarily reduce the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.'" *Id.* at 197 (quoting *Buckley*, 524 U.S. at 14). Contribution limits, meanwhile, though still subject to a "rigorous standard of review," impose a lesser restraint on political speech because they "permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* (quoting *Buckley*, 524 U.S. at 21). To survive this slightly lesser review, known as "closely drawn scrutiny" or "exacting scrutiny," a law may be sustained if the State "demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* (quoting *Buckley*, 524 U.S. at 21).

As noted above, in *Ted Cruz for Senate,* the distinctions between the standards are slight, and a restriction that fails one standard likely fails both. That is because "[t]h[e] Court has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its appearance." 566 U.S. at 306 (citing *McCutcheon*, 572 U.S. at 207; *Fed. Elec. Comm'n v. Nat'l Conservative P.A.C.*, 470 U.S. 480, 497 (1985)). If multiple types of activity are regulated (such

as restrictions on both contributions and expenditures), the Court will apply both classic "strict scrutiny" and "exacting scrutiny," and notably, the "analysis of the fit looks largely the same" under both standards. *Central Me. Power Co. v. Me. Comm'n on Gov't Ethics & Elec. Prac.*, 144 F.4th 9, 24 (1st Cir. 2025).

Critically, under either standard, the courts "consistently reject[] attempts to restrict campaign speech based on other legislative aims." *Ted Cruz for Senate*, 566 U.S. at 306 (citing *McCutcheon*, 572 U.S. at 191; *Bennett*, 564 U.S. at 749–750; *Citizens United*, 558 U.S. at 359). "However well intentioned such proposals may be, the First Amendment—as this Court has repeatedly emphasized—prohibits such attempts to tamper with the 'right of citizens to choose who shall govern them.'" *Id.* (quoting *McCutcheon*, 572 U.S. at 227) (citing *Davis*, 554 U.S at 742; *Bennett*, 564 U.S. at 750).

Here, Daniel's Law is not a campaign finance law, it is not intended to restrict political speech to prevent "quid pro quo" corruption or its appearance, and it is not specified to inhibit "contributions" or "restrictions," as it restricts both. Strict scrutiny applies because, as made unequivocally clear in *Ted Cruz for Senate*, "restrict[ions] [on] campaign speech based on other legislative aims" other than curbing corruption are categorically rejected. 566 at 306 (citing *McCutcheon*, 572 U.S. at 191; *Bennett*, 564 U.S. at 749–750; *Citizens United*, 558 U.S. at 359–360). Here, Daniel's Law's application to Sterling inhibits political candidates' abilities to

make and distribute political messages, as well as locate and solicit supporters, because it mandates the removal of their home addresses and phone numbers. That Daniel's Law's aim was to protect privacy does not negate the application of strict scrutiny—in fact, as the Court made clear in *Ted Cruz for Senate*, it should not even be a permissible basis to restrict Sterling's speech because it is an "other legislative aim" unrelated to preventing corruption. 566 at 306.

In other contexts, the Court has held that political communications, even if solicitations for donations, require "strict scrutiny" even in the face of privacy considerations. *Barr v. Am. Ass'n of Pol. Cons.*, 591 U.S. 610, 619 (2020) (applying strict scrutiny striking government-debt exception to the Telephone Consumer Protection Act ("TCPA"), a privacy statute, because it was content-based restriction on political speech); *id.* at 650 (Gorsuch, J., concurring in part) ("[I]f the government thinks consumer privacy interests are insufficient to overcome its interest in collecting debts, it's hard to see how the government might invoke consumer privacy interests to justify banning private political speech."). No case exists where political speech was not subject to strict scrutiny (or the similar "closely drawn" or "exacting scrutiny" standard). *See, e.g.*, *Miller v. Ziegler*, 109 F.4th 1045, 1050 n.1 (8th Cir. 2024) (quoting *Citizens United*, 558 U.S. at 340) (holding law that would ban former legislators and staff form lobbying as unconstitutional and in violation of the First Amendment because, "[c]ontent-[n]eutral or not, '[l]aws that burden political speech

- 24 -

are subject to strict scrutiny'"); *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) ("[A] content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers.").

By chilling and restricting a candidate from sending a political message, finding recipients for that message, or reaching a prospective donor altogether, Daniel's Law restricts core political speech, both contributions and expenditures, and general dialogue about political affairs.  Daniel's Law shrinks the pool of members of the public that can be located (and as discussed below, chills non-violative solicitations as well), and thus "'necessarily reduce[s] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.'"  *McCutcheon*, 572 U.S. at 197 (citing *Buckley*, 524 U.S. at 14; *Sable*, 492 U.S. at 126).

For these reasons, Daniel's Law is subject to (and cannot withstand) strict scrutiny as applied to Sterling.

**B.    The State's Interest In Daniel's Law Is Insufficient and Too Inconsistent to Constitute a Compelling, or Even Significant, Government Interest**

In the various *Atlas* cases, to date, no defendants have appeared to contest that Daniel's law serves a sufficient government interest to withstand scrutiny.  Each decision concerning the constitutionality of the statute, as well as every pleading in

every case, has explained the tragic story that prompted New Jersey's legislature to pass Daniel's Law with the purported aim of preventing similar tragedies from happening in the future. While aiming to protect the judiciary, law enforcement leaders, and others who are in a position to be the target of intimidation, harassment, and assassination is valid and admirable, Daniel's Law lofty goals (even if accepted at face value) are far too sweeping and akin to generalized crime prevention to constitute a "compelling government interest" that can survive strict scrutiny. Nor is the State's inconsistent protections of "privacy" sufficient to withstand constitutional examination.

To be clear, while a State certainly has a compelling interest in preventing violent crime, Daniel's Law is not intended to directly prevent violent crime—as this Court previously held, it is a privacy statute. 758 F. Supp. 3d at 335–36. As this Court put it: "[t]he New Jersey Legislature has concluded that covered persons should have the right to be let alone insofar as their home addresses and unpublished phone numbers are concerned…. not only to enhance the safety and security of covered persons but also to safeguard them from the fear of reprisal for doing their jobs. Daniel's Law is analogous to the long-standing common law tort for invasion of privacy for disclosure of the intimate details of a person's private life." *Id.*

The problem is that the New Jersey Legislature's goal of protecting privacy for likely hundreds of thousands of individuals due to tragic, rare events, is not an

interest in fixing a special problem—it amounts to generalized crime control through attenuated use of civil damages and criminal penalties to coerce removal of truthful information from the public sphere, in the hopes that actual criminals will not be clever enough to otherwise commit premeditated crimes.  Indeed, contrary to the often unchallenged notion that preventing crime or protecting privacy is a compelling government interest that can outweigh guaranteed constitutional rights, such generalized interests may fail if contested.  *See, e.g.*, *City Indianapolis v. Edmond*, 531 U.S. 32, 47–48 (2000) (in challenge to checkpoint program, holding that the city's "general interest in crime control" was afforded less weight in balancing competing interests of the checkpoint program and Fourth Amendment protections); *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) (holding government interest is curbing gun violence is irrelevant because "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, …. [b]ut the enshrinement of constitutional rights necessarily takes certain policy choices off the table").

Moreover, the State's purported interest in protecting privacy for a large group of individuals based on a list of professions and their family members is at odds with Daniel's Law's lack of application to protect that interest elsewhere.  As noted by Justice Gorsuch in *Barr* (and overlapping with the underinclusiveness analysis below), "a law's failure to address a wide swath of conduct implicating its supposed

concern 'diminish[es] the credibility of the government's [stated] rationale for [its] restrict[ion].'"  591 U.S. at 651 (quoting *City of Ladue v. Gilleo*, 512 U. S. 43, 52 (1994).   "Or, as the Court has elsewhere put it, the compellingness of the government's putative interest is undermined when its law 'leaves appreciable damage to [the] supposedly vital interest unprohibited.'"  *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 547 (1993)).  In other words, "[a] law's failure to cover 'significant tracts of conduct implicating [its] putatively compelling interes[t] can raise ... the inference that the ... claimed interest isn't ... so compelling after all.'"  *Id.* (quoting *Yellowbear v. Lampert*, 741 F. 3d 48, 60 (10th Cir. 2014).

Here, again, Daniel's Law seeks to protect the privacy of a sizeable piece of the public based on rare tragic events.  The purported state interest in passing Daniel's Law amounts to mild-prophylactic measures to make it more difficult for criminals to obtain otherwise still-public information and commit atrocities.  Again, while the State's goal of preventing further tragedies is laudable, the State's generic criminal control interest is insufficient to constitute a "compelling" interest that could withstand constitutional rigor.

C.    **Daniel's Law Is Not Narrowly Tailored to a Compelling Government Interest, Or Even Closely Drawn to a Significant Interest, As The Enforcement of Daniel's Law Against Sterling Has No Connection To The Apparent Goals of the Legislation**

Sterling incorporates and relies upon the arguments asserted in the defendants' facial constitutional challenge with respect to the lack of tailoring, underinclusiveness and overinclusiveness of Daniel's Law. *See* § II, *infra*. With no intention of repeating this argument in its entirety, Sterling expands on this argument to note that, within the context of the Free Speech clause, the Supreme Court has "held only once that a law triggered but satisfied strict scrutiny." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2301 (2025) (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 8 (2010) (upholding 18 U.S.C. § 2339B(a)(1), under a strict scrutiny test, "which makes it a federal crime to knowingly provide material support or resources to a foreign terrorist organization.")). The Government's compelling interest was "combating terrorism," and the law was narrowly tailored in that it "cover[ed] only a narrow category of speech … with foreign groups that the speaker knows to be terrorist organizations." *Holder*, 561 U.S. at 26, 28.

Far short of the *Holder* case, Daniel's Law cannot withstand strict scrutiny in the face of Sterling's as-applied challenge—nor could it survive the less "closely drawn" scrutiny. That is because restrictions on political speech must be "actually necessary" to achieve the State's compelling interest. *Alvarez*, 567 U.S. at 725 (quoting *Brown*, 564 U.S. at 799). "There must be a direct causal link between the

restriction imposed and the injury to be prevented." *Id.* "Because the Government is defending a restriction of speech as necessary to prevent an anticipated harm, it must do more than 'simply posit the existence of the disease sought to be cured.'" *Ted Cruz for Senate*, 596 U.S. at 306–307 (quoting *Col. Rep. Fed. Campaign Comm. v. Fed. Elec. Comm'n*, 518 U.S. 604, 618 (1996)).

Here, the Complaint is comprised entirely of conjecture that the availability of any covered person's information by any databroker results in tragedy—and with respect to Sterling, the allegations are even more attenuated because only certain clients are capable of obtaining any data from Sterling in the first place. Of course, the Court has "never accepted mere conjecture as adequate to carry a First Amendment burden," and the Government is required to "point to 'record evidence or legislative findings' demonstrating the need to address a special problem." *Id.* at 307 (quoting *McCutcheon*, 572 U.S. at 210 (quoting *Nixon*, 528 U.S. at 392). Where the Government fails to identify a single case, in the relevant context, supporting the "special problem," the Government does not meet its burden; "a handful of media reports and anecdotes that" purportedly "illustrate the special risks associated" with the speech in question are insufficient. *Id.* at 307–08.

As noted above, Plaintiffs rely on nothing more than media reports and anecdotal evidence about tragedies to suggest, without any concrete allegations, that the availability of information from Sterling *could* lead to a tragedy in the future.

This speculative connection between the problem (harassment and intimidation of individuals in the judicial system or law enforcement community) and Sterling's operations (aiding political candidates with their political messaging and campaign finance efforts) is far too attenuated to withstand any level of scrutiny. The Complaint is devoid of any allegation (let alone a plausible allegation) that inhibiting Sterling from locating a covered person's address or unlisted phone number as part of a political campaign would result in making any covered person safer. In other words, because Daniel's Law would not actually accomplish its stated purpose, it cannot justify chilling Sterling's political speech.

Besides considering "record evidence or legislative findings" that demonstrate the necessity of curtailing First Amendment rights to fix a "special problem," *id.*, even where the law's objectives are "legitimate, … when they affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 564 U.S. at 805. "[U]nderinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown*, 564 U.S. at 802). For instance, underinclusivity can be manifest where the law provides too many exceptions or employs standards that would result in disparate enforcement that frustrate the goal of the restriction altogether. *See Brown*, 564 U.S.

at 802. "Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." *Williams-Yulee*, 575 U.S. at 451.

Here, as noted above, Daniel's Law is fatally underinclusive, particularly as applied to Sterling, because it restricts Sterling's political speech and campaign finance operations, all while having exceptions in similar contexts, including the availability of statewide voter registration files by a chairperson of a county or municipal committee of a political party, a candidate, a vendor administering elections, or to anyone else by court order. *N.J.S.A.* 47:1B-3(a)(1)(a) to (e). Broad exceptions also exist in connection with the employees of public agencies and land finance, *see N.J.S.A.* 47:1B-3(a)(2) to (7), as well as for information already in published news stories and phone directories, *N.J.S.A.* § 56:8-166.1(f). While the stated goal of Daniel's Law is the preserve the privacy of a select (though large) group of individuals, there is no basis to restrict the political speech of Sterling, whose clients are strictly candidates, political campaigns, and non-profits, while allowing exceptions for some of these clients and their staff to obtain the same information under exceptions to Daniel's Law.

On the other side of the spectrum, a law is prohibitively "overinclusive" where it "encompass[es] more protected [expression] than necessary to achieve its goal."

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 578 (1993). Here, Daniel's Law has the unintended effect of chilling legitimate political speech because, in order to effectively comply with the statute, Sterling has to err on the side of censorship rather than risk violating the statute.  In *Jackson*, in which the Court held West Virginia's version of Daniel's Law to be overinclusive, the Court remarked that "[a]lthough receipt of a request to take down a given individual's information would alert even a high-volume speaker like defendants to the fact that that a potential West Virginia's Daniel's Law plaintiff's data is among the data points they display, it is difficult to imagine a mechanism by which they could preemptively sift through the data they display to identify every individual who might have served as a law enforcement officer in West Virginia at some point in their career." *Jackson*, 2025 LX 330690, at *47.  Though the Court ultimately indicated that a notice mechanism, which is present in Daniel's Law in this matter, could reduce the risk of overinclusivity, *see id.* (citing *Kratovil*, 261 N.J. at 27; N.J.S.A. § 56:8-166.1), nothing in Daniel's Law contemplates actually verifying if a takedown request is from a covered person, or if the takedown mechanism alleviates overinclusivity concerns when 21,000 takedown requests are purportedly sent at or near the same time.  *See N.J.S.A.* § 56:8-166.1(d).  While an isolated takedown request conceptually could avoid an overinclusivity problem, according to the Complaint, Plaintiffs inundated Sterling with thousands of takedown requests.  The

expected outcome of this tactic is not careful and selective removal of individuals to protect their privacy—it chills Sterling from operating altogether.

The definition of "disclose" in Daniel's Law exacerbates this issue, as it not only includes seemingly logical actions connected with actually disclosing information to a third-party, but also punishes "making available or viewable within a searchable list or database, regardless of whether a search of such list or database is actually performed." *N.J.S.A.* § 56:8-166.1(d). Due to the vagueness of this provision, it is unclear if mere possession (or the ability to possess) a covered person's home address and unlisted phone number violates Daniel's Law, or if the information must actually be placed into a list or database for purposes of searching. Faced with this uncertainty, Sterling is required to self-censor truthful information, restrict information sought by political campaigns, and not exercise its free speech rights, since Daniel's Law may punish the mere possession of an address on a computer system, regardless of whether it was the subject of a takedown request or has ever made its way into a searchable list or database.

In sum, Daniel's Law is not sufficiently tailored to serve the State's purported compelling government interest, or even closely drawn to a significant government interest. Thus, it cannot withstand First Amendment scrutiny and Plaintiffs' Daniel's Law claims should be dismissed with prejudice.

## II.    STERLING JOINS IN THE OTHER ARGUMENTS ADVANCED IN SUPPORT OF OTHER DEFENDANTS' MOTIONS TO DISMISS

As noted above, Sterling is a recent addition to the long list of cases initiated by Plaintiffs pursuant to Daniel's Law.  In making this motion for judgment on the pleadings, and in accordance with the Court's directives during the statue conference on September 12, 2025, Sterling does not aim to relitigate or redundantly litigate issues that the Court has already decided across the consolidated *Atlas* matters, even though it would have joined or asserted those arguments in the first instance.

Accordingly, rather than re-brief and reargue any points that are already before the Court, Sterling states, pursuant to *L. Civ. R.* 7.1(d)(4), that it joins the motion to dismiss filed on June 10, 2024, in *Atlas Data Privacy Corp. v. Lightbox Parent, L.P.*, No. 1:24-cv-04105-HB (Dkt. No. 27), and the motion to dismiss filed on March 18, 2025, in *Atlas Data Privacy Corp. v. DM Group Inc.*, Case No. 24-cv-04075-HB (Dkt. No. 59).  The arguments and briefs within these motions are fully incorporated herein, and Sterling preserves its right to raise anew or rely on any arguments made within those motions in the event of an amended pleading, remand, appeal, or any other procedural eventuality.

## <u>CONCLUSION</u>

For the reasons stated herein, Sterling respectfully request that the Court grant its Motion for Judgment on the Pleadings, and that Plaintiffs' Complaint be dismissed in its entirety and with prejudice.

- 35 -

**REED SMITH LLP**

*/s/ David G. Murphy*
David G. Murphy, Esq.

*Attorneys for Defendant*
*Sterling Data Company LLC*

Dated:  October 27, 2025